# EXHIBIT "D"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :
    :    CASE NO. 4:23-CR-159-01
v.    :
    :    (C.J. BRANN)
CEDRIC LODGE,    :
    Defendant    :

## GOVERNMENT'S SENTENCING MEMORANDUM

## I.  INTRODUCTION

Defendant Cedric Lodge ("Lodge") trafficked in human body parts he stole from the morgue where he worked.  He abused a position of trust. He undermined the confidence that individuals have in choosing to donate their bodies for medical training and scientific research.   He caused deep emotional harm to an untold number of family members left to wonder about the mistreatment of their loved ones' bodies.

Lodge treated the hearts, hands, brains, and faces of beloved human beings as if they were baubles to be sold for profit.  Lodge's conduct shocks the conscience.  The Sentencing Guidelines which apply here – written as if they would be used to punish the trafficking of mere stolen baubles – simply do not account for the egregiousness of this type

1

of crime, and the range they yield in Lodge's case is wholly insufficient to achieve a just sentence.

Accordingly, the United States respectfully recommends that the Court vary upward from the Guidelines range and impose a sentence of imprisonment of 120 months.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Between in or about 2018 through at least in or about March 2020, Cedric Lodge participated in the sale and interstate shipment of human remains stolen from the Harvard Medical School morgue, located in Boston, Massachusetts.

During that period Lodge, who was employed by Harvard as the morgue manager, would remove human remains, including organs, brains, skin, hands, faces, dissected heads, and other parts, from donated cadavers after they had been used for research and teaching purposes but before they could be disposed of according to the anatomical gift donation agreement between the donor and the school. Typically, a donor would elect to have their remains either returned to a designee or next of kin as-is for disposition, cremated and have the cremains returned to a designee or next of kin, or cremated and buried

2

in a memorial plot maintained by Harvard. Cedric Lodge would remove portions of some donated cadavers before they were cremated or returned without the knowledge or permission of his employer, the donor, or the donor's family.

Cedric Lodge also stole and sold other property from Harvard Medical School, including specimen cases bearing an "HMS" logo.

Cedric Lodge resided in New Hampshire with his wife, Denise Lodge. Directly or through Denise Lodge, Cedric Lodge communicated with individuals, including Andrew Ensanian, a resident of the Middle District of Pennsylvania, and Joshua Taylor, a resident in the Eastern District of Pennsylvania, online, including through Facebook, and negotiated sales of stolen remains to them. After agreeing on a price, payment was sent, frequently by PayPal to an account registered to Denise Lodge, and Denise Lodge would ship the remains from New Hampshire to Pennsylvania or the buyer would pick up the remains and transport them to Pennsylvania.

For example, in May 2018, Denise Lodge shipped Ensanian 24 hands, 2 feet, 9 spines, a partial skull, and 2 skull caps in exchange for

3

$3050. In February 2019, Denise Lodge shipped Ensanian a dissected head, which she told Ensanian came from a medical school, in exchange for $1150, and another head two days later for $575. In March 2019, Denise Lodge sent Ensanian five dissected human faces in exchange for $2300, after a conversation in which Denise Lodge indicated that her husband had set the price.

Cedric Lodge also sold Joshua Taylor stolen human remains. Between September 2018 and July 2021, Taylor sent Denise Lodge's PayPal account over $37,000. Cedric Lodge also sold stolen human remains to Katrina MacLean, a resident of Salem, Massachusetts. On multiple occasions, MacLean told Lodge she was buying remains from him to resell to other buyers. MacLean and Taylor also, at times, paid Cedric Lodge in cash.

Ensanian, MacLean, and Taylor, all sold many, if not all, of the remains purchased from the Lodges for profit, including to Jeremy Pauley, a resident of the Middle District of Pennsylvania. Pauley, in turn, also sold many of those items for a profit. Between June and September 2021, Cedric Lodge obtained human skin at the request of

4

MacLean, who provided it to Pauley in payment for his services in tanning another piece of skin into leather.

In March 2023, FBI agents executed a search warrant at the Lodges' residence, and seized, among other items, electronic devices, records, communications from Joshua Taylor, mortuary instruments, and a human skull.

On June 13, 2023, a five-count Indictment was filed in the Middle District of Pennsylvania against Cedric Lodge, charging him with Conspiracy to Commit Interstate Transportation of Stolen Goods and Interstate Transportation of Stolen Goods in violation of 18 U.S.C. §§ 371 and 2314.  Doc. 1.

On May 21, 2025, Lodge pled guilty to Count 2 of the Indictment pursuant to a plea agreement with the government.  PSR ¶ 4.

## III.  PROCEDURE

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), which rendered the United States Sentencing Commission Guidelines Manual ("USSG") advisory, the Court of Appeals set forth a three-step process when imposing a sentence:

5

1. Courts must continue to calculate a defendant's USSG sentence, regardless of *Booker*;

2. In doing so, they must formally rule on the motions of both parties, state on the record whether the Court is granting a departure and how that departure affects the USSG calculation, and consider pre-*Booker* case law, which continues to have advisory force; and

3. Courts are required to exercise their discretion by considering the relevant factors set forth in Title 18, United States Code, Section 3553(a), when imposing a sentence, regardless of whether it varies from the sentence calculated under the USSG.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

As of November 1, 2025, the Sentencing Commission simplified the Guidelines by removing step two of the three-step sentencing process. As amended, the Guidelines now provide a two-step sentencing process. This amendment removed most of the departures previously provided throughout the Guidelines Manual, including the upward departures previously recommended in related cases under

6

USSG §5K2.8. Extreme Conduct and USSG §5K2.0(a)(2) for
aggravating factors not adequately considered by the sentencing
guidelines.

The United States will address the need for a 120-month sentence
as an upward variance necessary to achieve the § 3553(a) factors.

### A. Sentencing Guidelines Calculation

The government notes that the guideline calculation in the final
Presentence Report ("PSR") is a total offense level 8 and Criminal
History Category of I for an advisory range of 0 to 6 months of
imprisonment and anticipates that will be the advisory range
determined at sentencing.

The United States acknowledges the Court's Memorandum and
Opinion of August 24, 2024, in *United States v. Pauley*, 4:23-CR-163,
regarding the issue of loss in view of *United States v. Banks,* 55F.4th
246, 256 (3d Cir. 2022), but incorporates the arguments set forth in its
Brief in Opposition filed in that case (Doc. 35) and formally objects to
Paragraph 27 of the PSR.  Had the loss calculation been included, the
offense level would have increased by six levels under §2B1.1(b)(1) of
the Guidelines.

As discussed more fully below, the remarkably low advisory guideline range in this case fails to reflect the egregious nature of the criminal conduct at issue. The United States asks that his Court vary above the otherwise applicable guidelines range and impose a term of imprisonment of 120 months.[1]

## B. Factors In Support of an Upward Variance

The government makes this request for a number of reasons.

First, Lodge's conduct was unusually heinous, cruel, and degrading. While this case is unique, it is not singular. Similar cases prosecuted across the country have led to similar sentences. Other provisions of the Guidelines also point toward justice requiring that this Court impose a lengthy sentence of imprisonment.

Second, Lodge inflicted tremendous damage on the institution he served and to the practice of making anatomical gifts.

---

[1] A upward variance of twenty-two levels results in an advisory guidelines range of 97 to 121 months.

Third, Lodge's criminal acts offend the rights of the dead and have inflicted grave suffering on hundreds of families.

### (1) The Unusually Heinous Sale of Human Remains

First, the nature of this crime is incredibly heinous as compared to a run-of-the-mill interstate transportation of stolen goods case typically sentenced under the Guidelines.  While departures are stylized as variances as of November 1, 2025, the *Queensborough* Court's reasoning in granting an upward departure remains persuasive. "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. . . . Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guideline cases." *United States v. Queensborough*, 227 F.3d 149, 162 (3d Cir. 2000), quoting *Koon v. United States*, 518 U.S. 81, 98 (1996).  *See also*, *United States v. Bull*, 828 F.3d 735, 739 (8d Cir. 2016) (upward departure warranted where conduct is "outside the heartland" of the typical case of its kind).

9

Nothing in § 2B1.1 accounts for the theft and sale of stolen human remains. In a "heartland" theft case, the Court is dealing with things – cars, tires, money. A Court need not address or contemplate the emotional toll of a victim whose grief over losing a parent is compounded by the theft and exploitation of his mortal remains. Nor do the Guidelines account for circumstances where the theft and ensuing interstate transportation violate the dignity of the deceased.

Lodge and other individuals involved in the theft and interstate trade of human remains engaged in conduct far more egregious than the typical stolen goods case. Indeed, were it not for their actions in commodifying and profiting from the sale of stolen body parts, one might be reluctant to classify such remains as "goods" at all. But Lodge stole human faces and other parts of cadavers and turned them into "stock," selling pieces of deceased people, advertising his dark wares, and creating a marketplace for this appalling trade.

In one example, Lodge provided skin to Katrina Maclean so that she could have it tanned into leather by Jeremy Pauley and bound into a book. What a deeply horrifying reality for hundreds of families to be left to contemplate. In another, Cedric and Denise Lodge sold a man's

10

face – perhaps to be kept on a shelf, perhaps to be used for something even more disturbing. What an impossible reality with which families must now grapple.

### a. Other cases involving human remains

While analogous prosecutions have been infrequent, there have been federal prosecutions of individuals engaged in the trafficking of stolen body parts, the fraudulent sale of human remains, and fraudulent actions related to human remains. Each time, forced to craft sentences for such heinous conduct, Courts have sentenced defendants to lengthy terms of imprisonment, often well above the advisory guidelines ranges and longer than the 120-month sentence sought here.

In *United States v. Rathburn, et al.*, the main defendant, Arthur Rathburn, who operated a medical corporation, was convicted at trial of seven counts of wire fraud and transportation of hazardous materials for defrauding buyers of cadavers donated for science. 771 Fed.Appx. 614 (6th Cir. 2019). He dismembered and rented those cadavers for medical and dental training in some cases without disclosing medical facts to include infectious diseases. *Id.* at 618-619. Rathburn was

11

sentenced to 108 months' imprisonment on the wire fraud charges.[2]
Rathburn's wife and co-defendant, testified at trial. She pled guilty and
was sentenced to 24 months' probation. *Id.*[3]

In *United States v. Hess, et al.*, No. 1:20-CR-98, funeral home
operators Megan Hess and Shirley Koch, each pleaded guilty to wire
fraud and aiding and abetting for their role in a scheme to illegally sell
body parts or entire bodies for body broker services in the District of
Colorado.  The victims did not consent to those sales or thought their
family member had been cremated.  Hess and Koch delivered cremated
remains to families with the representation that the cremated remains
were that of their deceased loved one when, frequently, that was not the
case.[4]

---

[2] Rathburn's guidelines were calculated as 135-168 months. The
Government recommended a sentence of 168 months. Government's
Memorandum in Aid of Sentencing, *United States v. Rathburn*, 2018
WL 2474003 (E.D.Mich. May 9, 2018).

[3] Sentencing information available at https://www.oig.dot.gov/library-
item/36412, last visited Dec. 9, 2025.

[4] Case described at https://www.justice.gov/usao-co/pr/sunset-mesa-
funeral-home-operators-sentenced-federal-prison-illegal-body-part-
scheme, last visited Dec. 9, 2025.

Hess was sentenced *twice* to 240 months' imprisonment and Koch was sentenced *twice* to 180 months' imprisonment. The case was remanded by the Tenth Circuit Court of Appeals based on errors in calculating the loss amount and in its findings concerning several enhancements. The Court imposed the same sentences on April 24 and August 27, 2025. *See United States v. Hess*, 106 F.4th 1011 (10th Cir. 2024); *see also* Government Exhibit 1.

The defendants in both *Hess* and *Rathburn* were involved in schemes to sell body parts to body brokers for purposes of medical research or were selling infected or diseased parts for the same purpose. The facts of this case are worse. Here, the defendant was selling stolen human remains knowing they would be sold and then either kept in a collection, sold, or otherwise used for the diversion of the disturbing "oddities" community. Like the defendants in the *Hess* case, the defendant here chose to steal and sell the human remains for a purpose not contemplated by the victims. Like the defendants in *Hess* who delivered cremated remains when they did not belong to the deceased family member, Lodge inflicts families with a similar wound.

13

In a case arising from this investigation, *United States v. Candace Chapman-Scott*, 4:23-CR-101, prosecuted in the Eastern District of Arkansas, the Court sentenced the defendant to the government's recommended 180 months.[5]  https://www.justice.gov/usao-edar/pr/little-rock-woman-sentenced-15-years-federal-prison-after-transporting-stolen-human.  Chapman-Scott, working as an apprentice mortician at a cremation business, repeatedly stole human remains, including the bodies of two stillborn babies, and trafficked them for profit to Jeremy Pauley.  She did so with full knowledge that Pauley intended to "plastinate" or otherwise preserve them for display, or, in the case of pieces of skin, "tan" them to bind books. *United States v. Candace Chapman-Scott*, 4:23-CR-101, *Doc. 61, p. 5.*

Most recently, in *United States v. Hallford*, 1:24-CR-113, in the District of Colorado, the Court imposed a 240-month sentence after refusing to accept an 11(c)(1)(C) agreement that capped the sentence at 180 months.[6]  Doc. 88, p. 1.   In that case, a funeral home director, Jon

---

[5] The advisory guidelines range appeared to be 10 to 16 months. *United States v. Candace Chapman-Scott*, 4:23-CR-101, Doc. 61, p. 2.
[6] The advisory guidelines range appeared to be 78 to 97 months. *United States v. Hallford*, 1:24-CR-113, Doc. 88, p. 2; sentencing information

14

Hallford, accepted payment from families for attending to the bodies of their loved ones, while actually allowing 190 bodies to rot and decay in the funeral home contrary to the wishes of the families and terms of the victims' funeral contracts. He provided decedent's family members with dry concrete mix instead of actual cremains. Doc. 88, p. 13. Lodge has left the donor families in this case to be haunted in the same way as the victim families in *Hallford*.

### b. Analogous Guideline provisions

The United States notes that this Court already observed, "[t]he law does not always align with what one may believe is right, just, or fair" in determining that the loss enhancement under §2B1.1(b)(1) would not apply to these offenses. *United States v. Pauley*, 4:23-CR-163, Doc. 40, p. 1 (quoting *Reiner v. Northumberland Cnty.*, No. 4:24-CV-00493, 2024 WL 2216852, at *1 (M.D. Pa. May 15, 2024)). But where a portion of the Guidelines may not directly control the advisory range or legally apply, as the Court has determined concerning the loss

---

available at https://www.justice.gov/usao-co/pr/colorado-springs-funeral-home-operator-sentenced-gruesome-fraud-scheme, last visited Dec. 9, 2025.

at issue here, courts *are* permitted to use analogous portions of the Guidelines in support of a departure or variance. *United States v. Larkin*, 629 F.3d 177, 193-194 (analogizing to a Guideline enhancement not applicable to the offense in support of a five-level increase in the offense conduct).

The Court should consider the following Guidelines in crafting an upward variance.

First, the United States suggests that justice requires an upward variance of six levels to account for Lodge's monetary gains conservatively estimated to be between $40,000 and $95,000. *See* USSG §2B1.1(b)(1).

Moreover, the Court should take the opportunity to acknowledge the other challenges of this case vis a vis portions of the Guidelines. The loss suffered by the donors' families is real and substantial, but not economic as required by the Guidelines to result in certain enhancements. Yet, in a fraud where 25 or more victims suffered substantial financial hardship, the offense would be increased by 6 levels. *See* USSG §2B1.1(b)(2)(C). Here, more than 25 families suffered substantial and ongoing emotional hardship after Lodge put a price on

16

something priceless.  A 6-level enhancement for that substantial harm is appropriate.

Moreover, the donors were *people*, but the economic statute of conviction does not implicate the serious enhancements crafted to account for the trafficking of *people*.  Alien smuggling offers insight. There, where a defendant treats more than 100 persons as commodities to be moved and traded, a defendant faces a 9-level enhancement.  S*ee* § 2L1.1(b)(2)(C).  Cedric Lodge did the same.  A 9-level upward variance is appropriate.

Paragraph 30 of the PSR reads **Victim Related Adjustment**: None. That is legally correct.  And yet, it is hard to reasonably conclude that the donors were not Cedric Lodge's victims.  It is hard to argue that they were not vulnerable.  In an offense involving a large number of vulnerable victims, a defendant faces a 4-level enhancement.  Lodge should face the same.

2.  <u>The Damage Done to the Anatomical Gift Program</u>

Just as it is hard to quantify the harm done to the donors and donors' families in this case, it is hard to quantify the harm Cedric

17

Lodge has done by abusing a position where he was trusted by his

employer.  Lodge exploited that trust in a deeply profound and

damaging way.  In so doing, he undermined the reputation of the

Anatomical Gift Program at Harvard Medical School. Consider that the

home page of that program[7] now appears as follows:



Before a potential donor can read about the need for donations, they are

met with the disturbing reality of Lodge's conduct.

---

[7] Screenshot from https://hms.harvard.edu/departments/anatomical-gift-program, last visited Dec. 9, 2025.

His actions led to a cascade of harm to Harvard University, Harvard Medical School, and the Anatomical Gift Program.

The Government attaches as exhibits the substance of two letters sent in June and July 2023 to the next of kin of approximately 400 donors who chose to participate in the Anatomical Gift Program and who may have been subject to Lodge's criminal conduct. *See* Government Exhibit 2.

In response to those letters, the U.S. Attorney's Office received 255 phone calls from concerned loved ones. In those calls, 190 individuals asked to be entered into the Victim Notification System to stay abreast of the movement of this and related criminal cases.

3.   The Ongoing Harm to Donors and Their Families

Before turning to family members, the United States first acknowledges the victimization of the individuals from whom parts were stolen and sold.  Their organs, tissues, and limbs were harvested for profit and sold without their consent or the knowledge or permission of their next of kin to be used as decoration or for the amusement of bizarre people interested in the macabre.

It is no exaggeration to describe the twisted conduct in this case as a human rights violation, a desecration of societal norms and long-held human notions of right and wrong.  This practice violates the human dignity of the deceased and inflicts suffering on their loved ones.

"The notion that the bodies of the dead and their human remains deserve respect and a dignified treatment is common to and deeply embedded within different societal, religious, and cultural traditions. Legal protections governing the treatment of dead bodies have long been established within international humanitarian law, international criminal law, human rights law, and domestic laws. . . .  The treatment of dead bodies is also of concern to international criminal law, which prohibits the mutilation of the dead. Violation of the bodies of the dead is increasingly recognized as an element of crime, as an attack on personal dignity."  United Nations Office of the High Commissioner for Human Rights, Special Rapporteur, Apr. 25, 2024.[8]

---

[8] Available at https://www.ohchr.org/en/calls-for-input/2024/call-input-protection-dead-persons-and-their-human-remains-including-victims, last visited Dec. 20, 2024.

"The protection of and respect for the dead is something that makes us human. It's prevalent, since the beginning of humanity, in all cultures and religions and is regulated in religious, cultural and social practices around the world, in national laws and also in International Humanitarian Law that applies in times of war.  The protection of the bodies and human remains of deceased persons . . . in many cases affects other rights of the victim and his or her family members. . . . There are a range of rights that are affected when there is no access to the body, when the victim's body is mutilated, destroyed, when their dignity is not respected."  Tidball-Binz, Morris, "Protecting and respecting the dead makes us human," July 5, 2024.[9]

"Death does not erase human dignity, either immediately or completely. The consequences of certain acts of self-determination reach beyond death, and command suitable respect. Human rights are rights accruing to the living; they protect and facilitate life itself. It is only possible to speak of rights of the dead in the sense that some acquired legal rights last beyond death, such as the right to be buried. Caring for

---

[9] Available at https://www.ohchr.org/en/stories/2024/07/protecting-and-respecting-dead-makes-us-human, last visited Dec. 20, 2024.

the dead in a manner appropriate to human dignity is primarily significant for the next of kin. Denying this right means that the next of kin are prevented from making their peace with the loss of an individual who is close to them. Suitable care for the dead is thus a right of the living."  German Commission for Justice and Peace, "How society cares for the dead – a matter of human dignity!" July 2024.[10]

Finally, the United States acknowledges the suffering of the many families impacted by Lodge's conduct in support of the 120-month sentence.  The conduct in this case strikes to the heart of one of the quintessential human experiences – death and the grieving process. When humans die, their loved ones frequently find solace in the peace they hope we find in death.  The theft and sale of these remains for profit is a violation of any notion of peace for the dead and those who love them, and shatters any sense of security they might have felt in the belief that their loved ones were treated with dignity and respect in their final disposition. Their own words support an upward variance:

One spouse wrote:

---

[10] Available at https://www.partner-religion-development.org/wp-content/uploads/2024/09/How-society-cares-for-the-dead-%E2%80%93-a-matter-of-human-dignity.pdf, last visited Dec. 20, 2024.

*For Bridget, donating her body to Harvard was a final gesture of generosity after a life dedicated to education and good works. But because of this scandal, what's left for us is disillusionment, shame, memories that will forever be disturbing and thought that will forever be haunting.*

A friend wrote:

*I loved B.A., and was so proud of her for donating her body to Harvard Medical School. Instead of feeling pride, I now am disgusted and saddened how it turned out. I don't understand why anyone would take advantage and violate her corpse.*

A daughter wrote:

*What Mr. Lodge and the court might not know is that this corruption transcends the bodily level and extends into the realm of memory. It will likely be a long time, if ever, I can look at a picture of my father and not have thoughts like, did he still have his head? did they sell his herculean right hand? were the skin of his tattoos made into cushions? Whether the answer is yes or no is not the issue so much as the families have had to go to that space with the real anxiety and pain such gruesome questions inflict.*

Another wife, writing about a husband lost to a brutal disease,

wrote:

*I grieved deeply for my husband of over 32 years-the man with whom I shared more of my life than I had ever lived without. For a time, the loss consumed me, and I struggled to find the will to carry on. It took immense strength to climb out of that despair and begin moving forward. As I sat in the living room, a wave of horror washed over me at the thought that he had been desecrated, his final act of generosity stolen. My boys and I were stripped of the opportunity to honor his*

23

*selfless nature, but, above all, the world was deprived of vital research. The theft and sale of remains not only robbed individuals but also robbed science of invaluable contributions from every victim whose sacrifice was exploited.*

She asks the Court to impose the maximum sentence. The United States asks the same.

### C. Assessment of Relevant § 3553(a) Sentencing Factors

The second and final step in the sentencing process is for the Court to consider all applicable factors set forth in Title 18, United States Code, § 3553(a) when fashioning an appropriate, individualized sentence. Here, a sentence of 120 months' imprisonment is necessary. It reflects consideration of the unique nature of the offense and meets the goals of punishment, deterrence, and potential rehabilitation.

The facts and arguments outlined above speak to the especially heinous and egregious nature and circumstances of the offense conduct in this case. The 120-month sentence is appropriate. It is necessary to reflect the seriousness of this offense, to promote respect for the law, and to provide just punishment.

Also relevant in the Government's recommendation is Lodge's personal history. Lodge had a nice childhood. PSR ¶ 42. He had a good and stable job at Harvard Medical School from 1995 to 2023,

24

earning $70,000 per year.  PSR ¶ 55.   He has no history of notable

substance abuse.  PSR ¶ 52.  While he faced financial loss due to his

wife's illness, it appears she received disability income.  PSR ¶ 56.  He

did not need to steal body parts to make money.

While his lack of criminal history is to his credit, it also points to

the fact that he should have known right from wrong.

The Government also requests the sentence in view of the need

for deterrence.  Given the widespread nature of this offense, the need is

paramount.  This investigation uncovered a secretive, nationwide

market for human remains, most of which are stolen by people, like

Cedric Lodge, who are trusted with human remains.  In this case,

positive evidence of the thefts was uncovered, and so the perpetrators

can be held accountable.  But most such transactions occur in the

shadows, and the sources of the remains are undisclosed.  Despite

knowing that "wet specimens" and fetal corpses cannot be obtained

legally, the down-market trade cannot be prosecuted as it is in this case

without proof that the items are stolen.  Thus, it is vital that, in a case

where the evidence proves conclusively that the remains were stolen, a

message must be sent to this "oddities" community, that the United

25

States does not tolerate the theft and sale of human remains.  This dark trade must end.

In making its recommendation, the government is also mindful of the relative culpability of all of the defendants who engaged in similar conduct in the related cases.  Several aggravating factors, as outlined above, have led the government to assess Lodge's culpability as higher than the other charged trafficking defendants charged in the Middle District of Pennsylvania, save Jeremy Pauley.  Lodge was employed in a position of trust, his criminal conduct damaged an institution, and his participation in this trade was significant in duration and volume.

## IV. CONCLUSION

Charitable human beings donated their bodies to Harvard Medical School's Anatomical Gift Program in an effort to assist in the training of medical students and toward medical discoveries.  Lodge stole their hearts, hands, brains, and faces do be sold for the amusement of the disturbing "oddities" community.  Lodge's conduct shocks the conscience.  Accordingly, the United States respectfully requests that the Court vary from the otherwise applicable Guidelines range and impose a sentence of 120 months of imprisonment.

26

December 9, 2025              Respectfully submitted,

                                    BRIAN D. MILLER
                                    United States Attorney

By:   /s/ Alisan V. Martin
        ALISAN V. MARTIN
        Assistant United States Attorney
        Attorney I.D. No. PA 316757
        United States Attorney's Office
        240 West Third Street, Suite 316
        Williamsport, PA  17701
        Telephone:  570-326-1935
        Email:  Alisan.Martin@usdoj.gov

27

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 4:23-CR-159-01 |
| v. | : | |
| | : | (C.J. BRANN) |
| CEDRIC LODGE, | : | |
| Defendant | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.  That on this Tuesday, December 9, 2025, she served a copy of the attached

## GOVERNMENT'S SENTENCING MEMORANDUM

by electronic means to:
Addressee:
Patrick A. Casey, Esquire

Dated:  December 9, 2025                    /s/ Alisan V. Martin
                                           ALISAN V. MARTIN
                                           Assistant United States Attorney

28

DEFENDANT:          SHIRLEY KOCH
CASE NUMBER:        20-cr-00098-CMA-GPG-2

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **one hundred and eighty (180) months.**

☐      The court makes the following recommendations to the Bureau of Prisons:

☒      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district:

☐      at  _____  ☐  a.m.  ☐  p.m.   on  _____ .

☐      as notified by the United States Marshal.

☐      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐      before 2 p.m. on  _____ .

☐      as notified by the United States Marshal.

☐      as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____ , with a certified copy of this judgment.

_____

UNITED STATES MARSHAL

By  _____

DEPUTY UNITED STATES MARSHAL

US v. Lodge, GEX 1, p. 1

Case No. 1:20-cr-00098-GPG   Document 463   filed 08/27/25   USDC Colorado   pg 2
Case 4:23-cr-00599-MWB   Document 188-1   Filed 12/09/25   Page 31 of 34
AO 245C (CO Rev. 11/20) Second Amended Judgment in Criminal Case                                    (NOTE: Identify Changes with Asterisks (*))

| DEFENDANT: | MEGAN HESS | Judgment — Page | 2 | of | 7 |
| CASE NUMBER: | 20-cr-00098-CMA-GPG-1 | | | | |

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of: **two hundred and forty (240) months.**

☐   The court makes the following recommendations to the Bureau of Prisons:

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

    ☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

    ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐   before 2 p.m. on _____ .

    ☐   as notified by the United States Marshal.

    ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

US v. Lodge, GEX 1, p. 2

*What follows is the main wording from the letters that were sent via expedited mail on June 14, 2023 from the Dean of Harvard Medical School to the registered next of kin for anatomical donors who generously donated their bodies to the Harvard Medical School Anatomical Gift Program. Unfortunately, email addresses for next of kin are not documented in our system, so we had to rely on printed and mailed letters instead of email.*

*HMS is sharing this for transparency. While our records include up to two documented next of kin for each anatomical donor, we know that additional family members and loved ones are affected by this news and we want everyone to have access to the information, resources, and supports available.*

*\*\*\**

I am profoundly saddened to report that today the U.S. Attorney's Office for the Middle District of Pennsylvania announced the indictment and arrest of Cedric Lodge, a former HMS employee, for the unlawful interstate transport of stolen human remains. Lodge worked in the morgue as part of the Anatomical Gift Program until HMS terminated his employment on May 6.

The indictment charges Lodge with the unlawful interstate transport of stolen human remains from "in or about 2018 through on or about August 16, 2022." We have been working with information supplied by federal authorities and examining our records, particularly the logs showing when donor remains were sent to be cremated and when Lodge was on campus, to try to determine which donors may have been impacted. *[In each letter, HMS then informed next of kin either that at this time we do not believe their loved one's remains were impacted, or that at this time we cannot rule out the possibility that their loved one's remains may have been impacted.]*

These alleged criminal acts are morally reprehensible and inconsistent with the standards that Harvard Medical School, our anatomical donors, and their loved ones expect and deserve. On behalf of the faculty and staff of Harvard Medical School, we are deeply sorry for the pain and uncertainty caused by this troubling news. We pledge to engage with you and support you during this distressing time.

**HMS has created a webpage with available resources for family members and next of kin at: hms.harvard.edu/family-resources. In addition, we have set up a toll-free information and support center you can reach at 1-888-268-1129.** This line is staffed by specially trained counselors who are currently available daily from 8 a.m. to 8 p.m., excluding holidays, and will do their best to answer your questions based on the information available at the time.

Additionally, the U.S. Attorney's Office has stated that they will continue to attempt to identify victims and contact as many of the victims' families affected by this case as possible. If anyone believes they or a family member may have been affected by the conduct charged in the indictments and information, please contact the U.S. Attorney's Office Victim and Witness Unit at usapam.victim.information@usdoj.gov or 717-614-4249.

An important and meaningful part of how all first-year medical and dental students learn human anatomy is through the dissection and examination of donor cadavers. As an HMS student myself, I learned anatomy in the same dissection laboratory used today. The enormous respect and gratitude I felt toward the donors and the deep reverence I held for the process of dissection remain present with me today. Learning anatomy transforms students from pre-meds to physician-healers; it is an experience that changes your heart and soul, forever. Those values are passed down every fall to our new students who, each year at the conclusion of their studies, hold a poignant, private memorial service to honor the donors.

As a learning community whose mission is to alleviate suffering and improve health and well-being for all, HMS is dedicated to introspection, innovation, and growth, particularly in the face of challenge. These values drive our commitment to do all we can to prevent something like this from happening again. To that end, Harvard University has appointed an external panel of experts to evaluate our Anatomical Gift Program and morgue policies and practices, with the goal of providing constructive feedback and recommendations to improve security for the program and for the generous whole-body donations it receives.

We owe it to you, as well as to our community, our profession, and our patients and their loved ones to ensure that HMS is worthy of the donors who have entrusted their bodies to us for the advancement of medical education and research. There is nothing more sacred and worthy of our attention and respect.

Sincerely,

George Q. Daley
Dean of the Faculty of Medicine
Harvard University

July 11, 2023

Dear Family Members and Next of Kin,

Each year, first-year medical and dental students gather to honor with profound gratitude and awe the gift that your family members made to our class. This memorial is held in the springtime, and it is an evening spent celebrating and honoring the life and contribution of each donor. Through musical performances, communal reflections, and the public reading of letters written to us by your loved ones, we honor their lives, pay tribute to their selfless contributions, and express gratitude for their generous gifts that allow us to grow at a formative time in our medical and dental education.

We know that every person's motivation for donating to our education is different, but by hearing from our donors that night, we are deeply moved by a common thread that resonated in every letter we received: one of love. Love for their clinicians, who they trusted with their lives; love for their communities, which they hoped would be the ultimate beneficiaries of the gift that they made to us; and love for their families, who are the world that they left behind. Ultimately, we also felt that they were expressing love for us — people they did not know, but who they trusted with a most sacred gift.

Newly minted medical students enter classrooms each August for a year of mostly lecture-based teaching. Time spent with donors is a rare opportunity to step out of the classroom and learn from our very first patients. It is in this sacred space that many students are shaped into nascent physicians, understanding the weight of the trust others put into the profession we are embarking on. In deciding to donate to the Anatomical Gift Program, you and your loved ones were promised that their gift would be treated with the utmost respect.

We, as students, are devastated by the actions reportedly taken by an HMS morgue staff member and others outside Harvard, which breached that very trust your loved ones placed in our profession. It is absolutely unthinkable that such an atrocity would ever occur. No words can undo those actions, and while we can never understand how you are feeling, we do hope that we can convey our deepest condolences to you and your loved ones.

With heartfelt sorrow and our sincere gratitude,

Members of the Harvard Medical School and Harvard School of Dental Medicine Classes